| | | |
|---|---|---|
| HONEYWELL INTERNATIONAL, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16 C 6828 |
| v. | ) | |
| | ) | Chief Judge Rubén Castillo |
| AUTOMATED BUILDING | ) | |
| CONTROLS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Honeywell International, Inc. ("Honeywell"), brought this diversity action seeking a declaratory judgment that it is entitled to terminate its dealership agreement with Defendant Automated Building Controls, LLC ("ABC"), as well as damages for breach of contract and defamation. (R. 32.) Presently before the Court is ABC's motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. (R. 12.) For the reasons set forth below, ABC's motion is denied.

## BACKGROUND

ABC, an Illinois limited liability company, is a dealer and provider of building control systems used in heating, ventilation, air-conditioning, and security. (R. 32 ¶ 5.) Although ABC sells products made by numerous manufacturers, the bulk of its business comes from selling systems made by Alerton, a Honeywell subsidiary. Servicing and selling Alerton systems make up the bulk of ABC's revenues, approximately 65% to 70%, with sales of Alerton's direct competitor, Distech, accounting for most of the remainder. (Tr. at 19.)

ABC first entered into a dealership agreement with Alerton in 1986, and was the first, and for 15 years the only, Alerton dealer in the Chicago area. (R. 13 at 2.) At some point, their

relationship soured and in 2003 Alerton sent ABC a notice of termination regarding their then-operative 1998 dealer agreement. (R. 30 at 2.) In subsequent litigation, the parties settled in 2004 and entered into a new dealership agreement after ABC filed a motion for a temporary restraining order and preliminary injunction. (*Id.*) In 2010, Alerton and ABC entered into the present dealership agreement (the "Agreement"). (Honeywell Ex. 2.) The Agreement grants ABC the non-exclusive right to sell Alerton products within a specific territory consisting of northeastern Illinois and northwestern Indiana. (*Id.* ¶ 1; *id.* at 23.) The Agreement also provides that either party may terminate the agreement "at will, with or without just cause, upon not less than thirty (30) days written notice of such termination." (*Id.* ¶ 8(a).)

On May 2, 2016, Alerton sent ABC a notice of termination effective July 31, 2016. (R. 32 ¶ 11; Honeywell Ex. 8.) In this letter, Alerton alleged that ABC breached the Agreement in four ways: by failing to pay for products on time, by failing to provide requested reports and information, by pursuing sales outside of its assigned territory, and by failing to meet performance objectives. (Honeywell Ex. 8 at 1.) ABC responded to the letter by contesting the validity of the termination, including by arguing that ABC is an Alerton franchisee under the Illinois Franchise Disclosure Act (the "IDFA"), 815 ILL. COMP. STAT. 705/1 *et seq.* (R. 32 ¶ 15.) Several heated exchanges followed, culminating in ABC's counsel allegedly threatening to sue if the Agreement were not continued beyond July 31, 2016. (*Id.* ¶ 20.)

Honeywell, Alerton's parent company, filed its action for declaratory and other relief on June 29, 2016. (R. 1.) Honeywell alleges that an actual controversy exists between the parties concerning whether Alerton was entitled to terminate the Agreement pursuant to its own termination provision and whether ABC is a franchisee under the IDFA. (*Id.* ¶ 28-29.)

Honeywell also seeks damages for breach of contract and defamation relating to a post-termination email sent by ABC's principals. (*Id.* ¶¶ 36, 40.)

On July 21, 2016, ABC filed its answer and counterclaim. (R. 10.) ABC seeks a declaratory judgment that the Agreement is a franchise under the IFDA and that Alerton's notice of termination was in violation of the IDFA and thus ineffective. (*Id.* ¶ 68.) Further, alleging that terminating the Agreement would result in immediate and irreparable harm to its business even if it later won declaratory judgment on the merits, ABC requested a temporary restraining order and preliminary injunction. (*Id.* ¶¶ 71-82.) In the alternative, if the Court does not issue injunctive relief and it later prevails on the declaratory judgment count, ABC seeks damages for wrongful termination. (*Id.* ¶¶ 84-87.)

On the same day, ABC filed its motion for a temporary restraining order and preliminary injunction. (R. 12.) ABC argues that injunctive relief is appropriate because allowing Alerton to terminate the Agreement would result in immediate and irreparable harm to its business even if it later won declaratory judgment on the merits. (R. 13 at 5-8.) ABC further contends that it has a high likelihood of succeeding on the merits, arguing that the Agreement meets all the IFDA's requirements for a franchise and that the IFDA's termination provision requires a franchisee to be given an opportunity to cure before termination. (*Id.* at 8-14.) ABC claims that the balance of interests weighs in favor of ABC, since Alerton would suffer no irreparable harm from an extension of the Agreement and termination would harm the public interest by disrupting service to current ABC-Alerton customers. (*Id.* at 14-15.)

Honeywell responded to ABC's pending motion for a preliminary injunction on August 11, 2016. (R. 30.) Honeywell argues that ABC's representations in a post-termination email to its employees—that it could continue its business with minimal disruption—demonstrates that ABC

would suffer no irreparable harm if the motion is denied. (*Id.* at 5-6.) Honeywell further disputes

that legal remedies would not suffice as "ABC can surely determine the value of its business."

(*Id.* at 6-7.) Regarding ABC's likelihood of success on the merits, Honeywell maintains that the

Agreement does not qualify as a franchise under the IFDA.[1] (*Id.* at 8-12.) Even if it does,

Honeywell maintains that it had good cause to terminate under section 19(c)(4) of the IFDA,

which provides that a franchisor need not provide pre-termination notice and an opportunity to

cure when the franchisee repeatedly breaches the contract. (*Id.* at 12-14.) It further suggests that

an injunction is inappropriate as it would require antagonistic parties to continue their business

relationship. (*Id.* at 14-15.)

On September 12 and 13, 2016, the Court held a preliminary injunction hearing on

ABC's motion, taking testimony from Mark Bevill, ABC's executive vice president, Grant

Bevill, ABC's president, Scott Pinder, Alerton's regional sales manager ("Pinder"), and Joshua

Cales, Alerton's general manager. (*See* R. 47; R. 48.) The Court summarizes the relevant

testimony below.

## I.     Failure to Pay on Time

All parties agreed that, throughout the term of the Agreement, ABC has consistently

taken paid its invoices 15-18 days late, (Tr. at 173, 231, 338), and paid late "every month just

about," (Tr. at 123). Grant Bevill attributed this practice to "cash flow." (Tr. at 346.) Pinder

testified that due to late payments, Alerton had repeatedly placed a "soft" hold on ABC's account

leading to delayed product shipments. (Tr. at 232-33.) Alerton's accounting department regularly

communicated with ABC's accounting department regarding these overdue payments and holds,

---

[1] Honeywell also suggested that an agreed order entered in connection with the 2004 litigation, in which ABC agreed that "the 2004 Dealership Agreement is not a franchise agreement under the franchise law of any State," forecloses ABC's claim to be a franchisee. (R. 30 at 7-8.) Because this agreement pertains to a different dealership agreement and ABC's status as a franchisee is not dispositive of the present motion, the Court will not consider this argument here.

but ABC still failed to bring its accounts current. (Tr. at 294-98.) In November 2015, Alerton placed a "hard" credit hold on ABC's account, meaning that no shipments would go out until the account was made current. (Tr. at 232-33.) After Pinder directly contacted Grant Bevill regarding this hard hold, ABC paid its past-due balance and Alerton resumed shipments. (Tr. at 234-35.) After the hard hold was removed, ABC again returned to paying late. (Tr. at 327.) At no point in this history of late payments did Alerton threaten to terminate the Agreement unless timely payments were made, until the issuance of the termination letter. (Tr. at 235.)

Mark Bevill testified that he did not recall being made aware of any particular defaults or being informed about any credit holds placed on ABC by Alerton. (Tr. at 123-24.) Grant Bevill similarly testified that he has only a "cursory" involvement with the day-to-day accounts payable department and does not get involved unless there is an unresolved issue. (Tr. at 330.) Further, the November hard hold was the only time that Pinder informed him of a hold on ABC's account until the May 2016 termination. (Tr. at 330.) He testified that Alerton has since returned ABC to normal payment terms and that ABC is now paying in a timely manner because he has "made it mandatory." (Tr. at 331.)

## II.    Reports and Information

Regarding business plans and reports, Mark Bevill stated that he created a business plan for the Totus Group, LLC ("Totus"), in 2014 that included business plans for ABC, FIX Consulting, and Commercial Building Controls Supply, all of which were owned by Totus. (Tr. at 136.) ABC had been negotiating with Alerton for months or years about becoming Alerton's exclusive Chicago dealer again, and the 2014 plan was created to show how this exclusivity would affect ABC's business. (Tr. at 130.) Other than this 2014 plan, ABC never created another business plan. (Tr. at 126-27, 337.)

Beginning in May 2015, Alerton began requesting more information about ABC's business. Pinder testified that, "I literally cannot do my job without having good, solid reports and business plans." (Tr. at 310.) On May 7, 2015, he sent an email to Grant Bevill requesting detailed growth plans, market information, customer reports, and other information about ABC's operations. (Tr. at 300-01.) According to Mark Bevill, ABC would need more information from Alerton to respond to this request, including how many dealers it intended to install in the Chicago area. (Tr. at 159-60.) ABC never provided the requested plan. (Tr. at 160, 302.) Pinder sent a second email to Grant Bevill on June 3, 2015, noting that he had not received a response to his previous email and reiterating his need for more information. (Tr. at 304; *see also* Honeywell Ex. 7.) Pinder testified that he never received the information he requested. (Tr. at 304.) On December 2, 2015, Pinder sent another email to ABC requesting information about its Alerton controls backlog, how much of that backlog it would digest in December, and its complete sales pipeline. (Tr. at 239-40; ABC Ex. RR.) About two weeks later, ABC responded with some information about its sales. (Tr. at 239-40; ABC Ex. RR.) Pinder never communicated to ABC that its response was inadequate. (Tr. at 240.) Finally, in April 2016, Pinder requested an updated sales pipeline and Alerton backlog report from Grant Bevill. (Tr. at 306-07.) Grant Bevill testified that he never provided this information in the remaining month before the Agreement was terminated, as he was waiting for input from other ABC partners. (Tr. at 336-37.)

## III.    Territory Restrictions

Although ABC's territory under the Agreement was limited to Illinois and Indiana, it did perform some business outside of this territory. Mark Bevill stated that he did not keep track of what ABC did in Wisconsin. (Tr. at 190.) However, he testified that ABC had a Wisconsin branch run by Jeff Sokol, an ABC employee. (Tr. at 161.) ABC's policy, when performing work

on Alerton systems in Wisconsin, was to buy any Alerton components from local dealers. (Tr. at 191.) Mark Bevill confirmed that ABC had signed an agreement for this purpose with ESI, a Wisconsin dealer, but he could not confirm whether it had actually bought any Alerton products from ESI. (Tr. at 189-90.) He acknowledged that ABC bought Alerton products from Masters, another Wisconsin dealer, although it had not entered into a written agreement with them. (Tr. at 191-93.) However, he testified that there was an oral agreement to buy product through Masters, arrived at in a meeting that Pinder attended. (Tr. at 191-92.) ABC used Masters's product to perform a job with Raymond School, as well as jobs upgrading the Kenosha Public Library and the Potawatomi software upgrade. (Tr. at 193-94.) In June 2014, Mark Bevill wrote a letter to Alerton in which he informed it that ABC had a "policy to buy any Alerton components from local distribution including Masters and/or ESI or any other source other than Automatic Building Controls, LLC." (Tr. at 191; ABC Ex. VV.) This letter responded to Alerton's letter of May 23, 2014, warning that it had learned that ABC had been distributing outside of its authorized territory and threatening termination. (Tr. at 109; Honeywell Ex. 13.) Mark Bevill also acknowledged receiving notice that Alerton was concerned about extraterritorial sales in April and June 2015. (Tr. at 107, 109-110.)

Pinder testified that he had been informed by local Wisconsin dealers that ABC was inappropriately operating outside of its territory. (Tr. at 224-25.) Cales claimed that Masters had notified him of ABC working in Wisconsin, while Climatec informed him of ABC working in California. (Tr. at 370, 375.) However, Pinder testified that he was without firsthand knowledge of any of ABC's alleged Wisconsin projects. (Tr. at 225.) He confirmed being present at ABC's meeting with Masters, but denied that this meeting resulted in any sort of agreement, oral or written. (Tr. at 226, 229.) Although Pinder was not with Alerton when ABC expressed its policy

7

of buying from local Wisconsin dealers, he testified that he viewed it upon joining Alerton. (Tr. at 228.) He also confirmed that he did not take any action in response to this policy despite the concern it caused him regarding ABC working outside of its territory. (Tr. at 230.)

## IV. Failure to Meet Performance Objectives

Finally, all parties agreed that ABC and Alerton never mutually agreed on any sales goals or performance objectives. (Tr. at 195, 209, 335.) Pinder testified that he regularly sent sales goals to ABC, characterizing these goals as "a target," "optimistic," and "aspirational to some degree." (Tr. at 213.) Although ABC typically did not respond to these sales goals either to accept, negotiate, or reject them, (Tr. at 306-07), Mark Bevill did testify that in June 2014 he explicitly rejected Alerton's sales goal, writing, "Your letter makes it sound as if, though, the $800,000 goal was presented and agreed to by Automatic Building Controls. This was never the case, and we never agreed to that number[.]" (Tr. at 196; ABC Ex. VV.)

## LEGAL STANDARD

In order to prevail on a motion for a preliminary injunction under Rule 65, "the moving party must make an initial showing that (1) it will suffer irreparable harm in the period before final resolution of its claims; (2) traditional legal remedies are inadequate; and (3) the claim has some likelihood of success on the merits." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 323-24 (7th Cir. 2015). If this is shown, "the court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to other parties or the public is sufficiently weighty that the injunction should be denied. *Id.* at 325.

## ANALYSIS

The first two prongs of the threshold preliminary injunction showings are straightforward in this case. As explained below, the Court finds that ABC has sufficiently shown that it will

suffer irreparable harm for which legal remedies are inadequate if the preliminary injunction is not entered.

## I.     Irreparable Harm

ABC claims that it would suffer irreparable harm in that Alerton-based sales and service constitute as much as 70% of its revenues, which would be lost if the Agreement were terminated.[2] (R. 13 at 5.) This loss would allegedly make ABC unable to retain its skilled workforce or its business relationships with existing customers, making even potential future reinstatement of the Agreement incapable of repairing the harm that would flow from its temporary termination. (*Id.* at 5-6.) Honeywell responds by pointing to an internal ABC email sent in the wake of the termination notice, which represented that ABC would be able to procure and service Alerton products even without a dealership agreement with Alerton. (R. 30 at 5-6 (citing R. 1-1 at 63-64).)

The Court finds that the loss of 70% of ABC's revenues, and the inevitable layoffs that would be triggered by the loss of business, would impose real harms on ABC that could not be simply undone by a future decision in its favor. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1090 (7th Cir. 2008) ("[S]imply returning [60% of plaintiff's business territory] following trial will not account for the incalculable losses [plaintiff] risks in the interim—namely, the potential loss of property, employees, or its entire business, as well as damage to its goodwill. These harms are both real and irreparable."). Contrary statements in the post-termination email are unconvincing, as the Court credits Mark Bevill's testimony at the hearing that this email was merely an "emotional" attempt to prevent its employees from panicking. (Tr. at 95.) Whether or not Honeywell agrees that ABC could not service its existing

---

[2] Although ABC's memorandum claims that Alerton-related business makes up nearly 80% of ABC's business, (R. 13 at 5), Mark Bevill's testimony established that this business in fact only constitutes 65% to 70%, (Tr. at 19).

Alerton-related customers or procure Alerton products elsewhere, Honeywell introduced no evidence contradicting Mark Bevill's and Grant Bevill's testimony that ABC would lose all its Alerton-related revenues. Accordingly, ABC has shown irreparable harm.

## II.  Inadequacy of Legal Remedies

Regarding the adequacy of legal remedies, ABC has established that money damages would not sufficiently compensate them for the loss of its business. "A damages remedy need be 'seriously deficient,' but not 'wholly ineffectual.' " *Girl Scouts*, 549 F.3d at 1095 (quoting *Roland Mach. Co. v. Dresser Inds., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)). The U.S. Court of Appeals for the Seventh Circuit has identified several circumstances resulting in an inadequate legal remedy, including "when a damages award may come too late to save the plaintiff's business" because the business "will lack the cash flow necessary to sustain the fixed costs of operating its business" without the injunction. *Id.* Even when the value of a plaintiff's business could be calculated, the Seventh Circuit nonetheless "recognize[s] that a longstanding business often has a vested interest in continuing in that business, not simply in receiving the monetary equivalent of its operation." *Id.*; *see also Roland Mach.*, 749 F.2d at 386 (observing that "the right to continue a business . . . is not measurable entirely in monetary terms" when the plaintiff would rather run its business than "live on the income from a damages award" (citation omitted)). If the movant's loss would not result in the total ruin of its business, it may still defy accurate calculation of damages because of unquantifiable impairment of the business's capacity. *See, e.g.*, *Girl Scouts*, 549 F.3d at 1095 (finding the plaintiff's damages "virtually impossible to compute" based in part on "the potential loss of institutional knowledge accompanying the unwanted termination of employees"); *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 902 (7th Cir.

2001) ("[I]t is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill[.]" (citation omitted)).

ABC alleges that there is a "substantial risk" that it would lack the resources to maintain its business if it lost its Alerton dealership.[3] (R. 13 at 7.) While ABC did not present any evidence to this effect in the preliminary injunction hearing, it did amply establish that termination would cause a significant loss of revenue requiring major workforce reductions. (R. 13 at 5, 7; Tr. at 90.) Being forced to fire many of its Alerton-trained technicians would constitute a significant loss of institutional knowledge. (Tr. at 27-30; Tr. at 89.) ABC also argues that it would lose goodwill in the market as "ABC's good will is enmeshed in its association with Alerton." (R. 13 at 6.) Because ABC has shown that termination of its relationship with Alerton threatens to cripple or destroy its business rather than simply cost it money, the Court finds that money damages would not make ABC whole.

## III. Likelihood of Success on the Merits

Determining whether the movant has a likelihood of success on the merits is simply a "threshold" issue, and it only requires that the movant have a "better than negligible" chance of prevailing. *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016). Although the movant typically bears the burden of establishing its better than negligible chances, "the burdens at the preliminary injunction stage track the burdens at trial" on merits questions. *Wisc. Right to Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014) (citation omitted). Accordingly, ABC bears

---

[3] Honeywell argues that ABC cannot prevail on this ground because it "is a 'going concern with numerous clients,'" which sells products other than those obtained directly from Alerton." (R. 30 at 6-7 (quoting *Kuraki Am. Corp. v. Dynamic Int'l of Wisc., Inc.*, Nos. 14-C-583, 14-C-628, 2014 WL 2876014, at *4 (E.D. Wisc. June 24, 2014)).) *Kuraki* did not go so far as to create a bright-line rule, but instead focused on how the plaintiff there was "a *profitable*, going concern" that was, as a factual matter, unlikely to go bankrupt due to the severed business relationship. *Kuraki*, 2014 WL 2876014, at *4 (emphasis added); *see also id.* at *2 (discussing how the plaintiff's sales of the defendant's products made up 3.4% of the plaintiff's revenues in the prior fiscal year).

the burden of establishing that it was a franchise, and Honeywell bears the burden of establishing that it terminated with good cause.

If ABC fails to show that the Agreement established a franchise, then it has no chance of prevailing on the merits. The Agreement provides that "[t]his Agreement may be terminated by either party at will, with or without just cause, upon not less than thirty (30) days written notice of such termination to the other." (Honeywell Ex. 2 ¶ 8(a).) Alerton's termination letter provided ABC with approximately 90 days' notice. (Honeywell Ex. 8 at 2.) Thus, its termination falls squarely within the Agreement's provisions when considered alone.

In order for ABC to prevail on the merits, then, it must show that the Agreement established a franchise. Even if the Agreement allows Alerton to terminate at will, the IFDA imposes extracontractual rules regardless of the parties' intent. *See Brenkman v. Belmont Mktg., Inc.*, 410 N.E.2d 500, 503 (Ill. App. Ct. 1980) ("None of the criteria set forth in the statute make the subjective intent of the parties a determinative factor in identifying a franchise relation."). For ABC to succeed, however, Honeywell must also fail to establish that it had good cause to terminate under the IFDA. If Honeywell can show good cause for terminating, then ABC does not have even a negligible chance of prevailing on the merits.

Section 19 of the IFDA establishes that:

(a) It shall be a violation of this Act for a franchisor to terminate a franchise of a franchised business located in this State prior to the expiration of its term except for "good cause" as provided in subsection (b) or (c) of this Section.

(b) "Good cause" shall include, but not be limited to, the failure of the franchisee to comply with any lawful provisions of the franchise or other agreement and to cure such default after being given notice thereof and a reasonable opportunity to cure such default, which in no event need be more than 30 days.

(c) "Good cause" shall include, but without the requirement of notice and an opportunity to cure, situations in which the franchisee:

(1) makes an assignment for the benefit of creditors or a similar disposition of the assets of the franchise business;

(2) voluntarily abandons the franchise business;

(3) is convicted of a felony or other crime which substantially impairs the good will associated with the franchisor's trademark, service mark, trade name or commercial symbol; or

(4) repeatedly fails to comply with the lawful provisions of the franchise or other agreement.

815 ILL. COMP. STAT. 705/19.

In its termination letter, Alerton identified four reasons for terminating the Agreement: it claimed that ABC had failed to pay its bills on time, failed to provide requested reports and information, sold and serviced Alerton systems outside of its dealership territory, and failed to meet performance objectives. Alerton argued that each of these practices were grounds for termination under the Agreement. The Court will address each in turn.

A.    **Failure to Pay on Time**

Honeywell argues that ABC's consistent failure to pay balances due within 30 days, as specified in the Agreement, gave good cause for termination. The Agreement provides for terms of payment that "the entire amount is due 30 days from the time of receipt of invoice." (Honeywell Ex. 2 ¶ 13.) Further, it states that "[i]f Dealer fails to pay any amounts due in the required time period, Dealer agrees that Alerton may, in its sole discretion, do any one or more of the following, unless precluded by law: . . . Terminate this Agreement." (*Id.* ¶ 14.) The Agreement also provides that "[t]ime is of the essence in this Agreement and the occurrence of any one of the following events shall constitute a Default under this Agreement: (1) Failure of Dealer to pay when due any amount payable to Alerton under the terms of sale." (*Id.* ¶ 21.)

The record clearly establishes that ABC regularly failed to pay its bills within the 30 day terms established by the Agreement. Monthly sales reports sent to ABC by Alerton show that ABC maintained at least some overdue balance in every month. (*See* ABC Exs. FF, GG, HH; Honeywell Exs. 18-23.) From December 2014 to December 2015, the average percentage of ABC's total outstanding balance that was overdue was approximately 35%.[4] In December 2015, more than two thirds of ABC's balance was overdue. (Honeywell Ex. 18 at 3.) During his testimony, Mark Bevill admitted that from 2010 until the termination letter, ABC "may have occasionally been within [the 30-day pay period], but probably the better statement would be, you know, we were 99 percent over it probably." (Tr. at 173.) Grant Bevill, describing his November 2015 request for a 60-90 day payment term, stated that "I wanted them to reflect what we had been normally paying for the last five years." (Tr. at 338.) ABC even acknowledged in its post-hearing brief that "[t]he evidence was unrebutted that ABC never paid its invoices on time—that it consistently paid its invoices on average between 45 and 48 days instead of 30 days—throughout the six-year term of the agreement." (R. 49 at 6.) Honeywell has demonstrated that ABC regularly failed to pay its bills on time in violation of the Agreement.

Under section 19(b) of the IFDA, good cause exists when the franchisee has failed to cure a default after being given notice of a breach. Based on the record, Alerton repeatedly gave notice to ABC that it was in violation of the Agreement. Its monthly reports specifically listed the amount that ABC was overdue every month. Further, Alerton placed various levels of credit holds on ABC over the course of their business relationship due to overdue payments. Pinder testified that Alerton had placed "soft" credit holds on ABC on "[m]ultiple" occasions, resulting

---

[4] These reports only provide snapshots of ABC's balances on a particular day of the month. (Tr. at 113, 222-23.) Any amounts that were overdue for 15-18 days between each report would not be noted as overdue on the reports. Accordingly, the Court finds that it is likely that a greater portion of ABC's balance was at some point overdue than is reflected in the reports.

in product shipments being held up. (Tr. at 233.) He also stated that Alerton's accounting department would, on a monthly basis, communicate with dealers who are past due on payments, including ABC. (Tr. at 294-95.) He confirmed that he had seen such communications to ABC in 2016, and that ABC had not brought its accounts current before the May 2016 termination. (Tr. at 297-98.)

More significantly, Alerton placed a "hard" credit hold on ABC in November 2015, meaning that ABC's account was frozen and no shipments whatsoever would be made until the account was brought current. (Tr. at 290.) Due to this hold, Pinder emailed Grant Bevill on November 9, 2015, notifying him of the hold and observing that ABC's payment schedule was "still not to terms." (Honeywell Ex. 15 at 1.) He further noted that ABC was "very consistent in how you pay, it is just not to terms" with an average of 15 days late. (*Id.*) In a related email on November 13, 2015, Grant Bevill acknowledged to Alerton's accounting department that "we pay in roughly 45 days" and requested an extension of payment terms to 60-90 days. (Honeywell Ex. 17 at 1.) Pinder denied this request. (Tr. at 293.) After the hold was released, ABC continued to pay late. (Tr. at 327.)

The Court finds that Alerton provided ABC sufficient notice of its default and an opportunity to cure. Although the notice provided to a franchisee may include a statement that failure to cure will result in termination, the statute does not on its face require this. 815 ILL. COMP. STAT. 705/19(b). *See Scholl's 4 Seasons Motor Sports, Inc. v. Arctic Cat Sales, Inc.*, No. 09 C 7954, 2010 WL 4736495, at *2 (N.D. Ill. Nov. 16, 2010) ("Plaintiff contends that, because defendant did not specifically note that the Dealer Agreement would be terminated if plaintiff did not pay, defendant's notice to plaintiff about the default violates the IFDA. The court finds no authority to support plaintiff's contention."). The Court has only located a single case applying

15

the IFDA that requires a notice to threaten termination. *H.R.R. Zimmerman Co. v. Tecumseh Prod. Co.*, No. 99 C 5437, 2001 WL 1356153, at *4 (N.D. Ill. Nov. 2, 2001), *adopted as modified* No. 99 C 5437, 2002 WL 31018302 (N.D. Ill. Sept. 9, 2002) ("The clear directive of [section 19(b)] is that the franchisor must advise the franchisee that the franchisee is "in default" and at risk of losing its franchise if it does not "cure such default" within a specified time."). With respect, the Court finds this reasoning unpersuasive. The statute itself only requires by its terms that notice be given *of the default*, not of the franchisor's potential intent to terminate. Accordingly, the Court finds that notice need not be phrased as an explicit threat of termination in order to be effective under section 19(b). ABC takes the position that it began for the first time to comply with the payment schedule when Alerton issued its termination letter and "ABC was put on notice that Alerton was serious." (R. 49 at 7.) The Court declines to find that compliance with clear contractual terms is entirely optional, even in the face of repeated requests to cure, unless the other party speaks the magic word "termination." What counts is that notice of a breach has been communicated, and that the franchisee be given a reasonable chance to cure this breach. That clearly occurred here.

Pinder's email on November 9, 2015, clearly communicates that ABC had not been paying "to terms" and requested that it change its behavior. (Honeywell Ex. 15 at 1.) Although ABC apparently paid its overdue balances at that time, it immediately returned to paying late again. (Tr. at 327-28.) ABC's practice of late payment was in breach of the Agreement, and though it paid its overdue balance in order that Alerton would ship products to it, it immediately returned to breaching behavior. Even if ABC's response to this hard hold did not evidence a sufficient failure to cure, Pinder's unchallenged testimony that his accounting staff had repeatedly notified ABC employees of its failure to pay to terms establishes that notice of breach

was provided to ABC. (Tr. at 294-95.) Despite this notice, ABC continued to regularly pay late and did not make timely payment "mandatory" until after Alerton sent its termination letter on May 9, 2016. (Tr. at 331, 340.) Accordingly, ABC received notice and an opportunity to cure, and it did not change its behavior. This is all that is required to establish good cause for termination under section 19(b) of the IFDA.

Even if Honeywell had not established that it provided notice and an opportunity to cure, the Court finds that ABC's continuing practice of late payment constituted a repeated failure to comply with the Agreement under section 19(c)(4) of the IFDA. The IFDA does not provide detailed guidance on how many breaches of the franchise agreement are required to justify termination under section 19(c)(4), but case law within this Circuit suggests that this is not an overly technical determination. In *Original Great American Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.* [*Cookie Company*], 970 F.2d 273 (7th Cir. 1992), the franchisee argued that three violations within 12 months, which the franchise agreement in that case required for termination, did not constitute repeated violations under the IFDA. *Id.* at 279. The Seventh Circuit did not decide this question, but did suggest the proper inquiry: "Even if the agreement violated the Franchise Disclosure Act by failing to specify some higher number, this would authorize the court, not to strike the entire provision, but only to restrict it to cases in which *the franchisee's violations could fairly be described as repeated*[.]" *Id.* (emphasis added).

The Court finds that ABC's continual failure to pay Alerton within 30 days as prescribed by the Agreement clearly qualified as a repeated violation. The parties have submitted reports detailing ABC's balances due on a monthly basis, and every single one of these reports shows some overdue balance. (*See* ABC Exs. FF, GG, HH; Honeywell Exs. 18-23.) In April 2015 and May 2015, ABC had very small overdue balances of approximately 3.8% and 5.4%, respectively.

(ABC Exs. FF-2, FF-3.) These months were bookended by 70% and 52.5% overdue balances, however. (Honeywell Exs. 19, 22.) Grant Bevill testified that the reason for these overdue balances was "cashflow," (Tr. at 346), and confirmed that he did not make timely payment "mandatory" until after receiving Alerton's termination letter, (Tr. at 331, 340). Whatever the size and cause of these overdue balances, they represent regular breaches of the Agreement's requirement that all payments be made within 30 days. (Honeywell Ex. 2 ¶ 13.) Because the record demonstrates that ABC did not make timely payments for any month in the record, and certainly not for any month in 2015, the Court is compelled to find that ABC's violations were repeated. Because Honeywell established that ABC repeatedly breached the Agreement, it has shown a high likelihood of success on its claim that it had good cause for termination even without notice and an opportunity to cure. 815 ILL. COMP. STAT. 705/19(c)(4).

To avoid this result, ABC puts forward an alternative interpretation of section 19(c)(4), arguing that franchisors can only terminate under this section when they have *already* provided notice and an opportunity to cure, and when the violations are "serious." (R. 33 at 12-14; R. 49 at 7.) ABC first argues that "[i]t is not by accident that the provisions of Section 19(c) follow those contained in Section 19(b)," (R. 33 at 12), from which it infers that "[a] franchisor cannot 'bank' a franchisee's alleged defaults, not give notice, not give an opportunity to cure, and then at a time of its choosing withdraw those banked defaults and proceed directly with a termination under Section 19(c)(4)," (*Id.* at 13). ABC suggests that *Cookie Company* supports this interpretation, because in that case the franchisor had previously provided such notice. (*Id.* at 14.)

ABC's argument is unavailing. The Court first notes that it has already found that Alerton provided ABC with sufficient notice and opportunity to cure under 19(b). (*See id.* ("The defaults [in *Cookie Company*] were cured, but then repeatedly violated again. . . . Under those facts, it is absolutely appropriate for the franchisor to declare 'enough is enough' and proceed to termination under Section 19(c)(4).").) Second, ABC's interpretation fails as a matter of statutory interpretation. It proposes that section 19(b) serves as an exhaustion requirement without which 19(c)(4) cannot be invoked, based on the two sections' proximity. However, this is not a rational reading of the statute's structure. The other section 19(c) subsections do not allow for a similar exhaustion requirement; section 19(c)(3), for example, allows termination without notice or opportunity to cure when the franchisee has been convicted of a felony. 805 ILL. COMP. STAT. 705/19(c)(3). If a section 19(c)(4) termination were necessarily a later stage in an attempted section 19(b) termination, it would surely have been included as a subsection or clause in section 19(b) and not grouped with several other circumstances that do not admit to any section 19(b) exhaustion requirement.[5] As for the "seriousness" required to terminate under section 19(c)(4), the wording and structure of the statute suggests that the repeated nature of the violations itself is what justifies the absence of a notice and opportunity requirement. A minor breach may be a passing, inconsequential mistake, but a repeated and sustained practice of

---

[5] ABC quotes *H.R.R. Zimmerman*, in which the court stated that "[a]pplying Subsection (c)(4) here would make Subsection (b) meaningless." (R. 33 at 13 (quoting *H.R.R. Zimmerman*, 2001 WL 1356153, at *4).) This Court views this statement as limited to the facts of that case, in which the franchisor sought to terminate under section 19(c)(4) on the basis of a series of discrete alleged breaches rather than repeated breaches of the same sort. *H.R.R. Zimmerman*, 2001 WL 1356153, at *4.

flouting contractual terms surely qualifies as serious.[6] This "repeated" standard is easily satisfied in this case by more than a preponderance of the evidence.

ABC also argues that the repeated nature *itself* of ABC's late payment shows that this practice did not constitute good cause to terminate, because Alerton continued to accept late payments and did not object on every possible occasion. (R. 49 at 6-7.) It argues that by making ABC a Platinum Dealer and not mentioning late payment in a 2014 Performance Improvement Plan, Alerton communicated that it "had absolutely no problem with ABC's payment practices." (*Id.* at 7.) Leaving aside the evidence in the record that Alerton *did* communicate its problem with late payment, Alerton's acceptance of late payments from ABC, or failure to terminate sooner, does not constitute waiver by Alerton of the payment terms set forth in the Agreement. The Agreement explicitly forecloses this type of waiver: "Failure of Alerton to enforce any of the provisions of this Agreement shall not be construed to be a waiver of such provisions or rights or in any way affect the validity of this Agreement." (Honeywell Ex. 2 ¶ 25.) Likewise, the Seventh Circuit has affirmed a party's right to exercise its contractual rights in the event of breach even after that party continued to work with the breaching party. In *McElroy v. B.F. Goodrich Co.*, for example, the Seventh Circuit rejected the defendant's waiver argument, holding instead that the fact that the plaintiff had continued to work for the breaching defendant

---

[6] ABC also argues that under *Cookie Company*, allowing a franchisor to terminate based on repeated violations without providing notice and opportunity would constitute bad-faith opportunism. (R. 33 at 14-15.) ABC misses the main lesson of *Cookie Company*'s discussion. The general rule is that "[c]ontract law does not require parties to behave altruistically toward each other" and that the law "does not provide remedies for spiteful conduct or refuse enforcement of contractual provisions invoked out of personal nastiness." *Cookie Company*, 970 F.2d at 280. ABC is correct that "it is bad faith to invoke a contract provision dishonestly to achieve a purpose contrary to that for which the contract had been made," but the contract provision here allowed Alerton to terminate based on a failure to pay on time, and that is all that it has done. (R. 33 at 14.) As in *Cookie Company*, Alerton here has not attempted to take over the business and value created by ABC based on trivial breaches. *Cookie Company*, 970 F.2d at 280. It has instead sought to terminate an acrimonious business relationship based on a continuous failure to pay it as explicitly set forth in the Agreement. *See Zeidler v. A & W Restaurants, Inc.*, 301 F.3d 572, 575 (7th Cir. 2002) ("Bad faith only negates contractual breaches that it has brought about; if a party acting in bad faith has a reason to terminate . . . that his or her bad faith has not caused, then he or she can do so.").

did not mean that the plaintiff had abandoned any claim against the defendant, but rather that he was "simply making the best of a bad deal." 73 F.3d 722, 724-25 (7th Cir. 1996). That court also held that Illinois courts only find waiver where it either induced reliance or was "*clearly inferable from the circumstances.*" *Id.* at 724 (citation omitted). In light of Alerton's repeated communications to ABC that late payment was not acceptable, its waiver cannot be inferred and any reliance that ABC may have placed on Alerton's acceptance of late payment was not reasonable.

Because Honeywell has established that ABC failed to pay on time after receiving notice and opportunity to cure, and because it repeatedly violated the Agreement with respect to timely payment, the Court finds that Alerton had good cause under the IFDA to terminate the Agreement. Thus, even if ABC has shown that it was a franchisee, it cannot show that it has a "better than negligible" chance of success on the merits. *D.U.*, 825 F.3d at 338.

### B.    Reports and Information

Honeywell has also established that Alerton had good cause to terminate based on ABC's failure to provide requested business plans and other information. The Agreement requires ABC to:

> Provide, at Alerton's request: [i] forecasts of anticipated sales of the Products, specifying quantities and total dollars of Products that the Dealer expects to sell over rolling 90-day time frames; and [ii] annual assistance to Alerton in developing forecasts of the potential end-user sales throughout the Territory.

(Honeywell Ex. 2 ¶ 3(e).) Honeywell established at the preliminary injunction hearing that ABC repeatedly failed to comply with this provision, giving Alerton good cause to terminate under section 19(c)(4).

The Agreement only requires ABC to provide this information to Alerton "at Alerton's request." Honeywell showed at the hearing that Alerton requested this information at least four

times in the year preceding termination, and that ABC failed to comply on at least three occasions. On May 7, 2015, Pinder sent an email to Grant Bevill requesting a variety of information about ABC's business. (Honeywell Ex. 29 at 1-2.) Among other things, he requested five-year plans, information about ABC's current Alerton sales and personnel, information about ABC's market penetration, and historical customer reports. (*Id.*) Mark Bevill testified that ABC never responded to this request for reports because it could not formulate a business plan without more information from Alerton about its own plans in the region. (Tr. at 159-60; *see also* Tr. at 302.) Approximately one month later, Pinder sent a second email to Grant Bevill noting that he had received no response to the May 7 email and reiterating his need for the requested information. (Honeywell Ex. 7 at 1-2.) Pinder testified that he never received the requested information. (Tr. at 304.) Pinder again requested information on December 2, 2015, asking for ABC's total Alerton Controls Backlog, how much of that it would digest in December, and its complete sales pipeline. (ABC Ex. RR at 2.) On December 17, 2015, an ABC employee responded in part. (*Id.* at 1.) Although he did not answer what the total backlog was, he stated that ABC would digest "[a]nother $10k possible." (*Id.*) In response to the request for ABC's complete sales pipeline, he answered, "For jobs we are 90% sure will be approved in 1st quarter '16 - $132,155.00. Beyond what we feel positive about in 1st quarter '16 we have roughly another $300,000.00 out there." (*Id.*) Finally, Pinder emailed Grant Bevill on April 5, 2016, requesting "an updated sales pipeline along with a Backlog report for your Alerton business." (Honeywell Ex. 28.) Grant Bevill emailed him back two hours later mentioning other matters but without any acknowledgment of this request. (Honeywell Ex. 30 at 1.)

The Court finds that Honeywell has shown that ABC repeatedly failed to provide requested reports and other business information as required under the Agreement. Alerton

22

requested business information from ABC at least four times in the year preceding termination, and it only received a partial response once. Each of these requests involved forecasts of anticipated sales and information necessary for Alerton to forecast sales in ABC's dealership territory. (Honeywell Ex. 2 ¶3(e).) The only response Alerton received to its requests provided three barebones numbers without any additional information and failed to answer one of the three questions. (ABC Ex. RR at 1.) This Court is satisfied that ABC's failures to comply with Alerton's requests, taken together, represent repeated material breaches of the Agreement. Alerton requires information from ABC in order to operate its own business, and it contracted for the right to request this information. That ABC halfheartedly addressed one of these requests does not take away from the fact that it engaged in a practice of ignoring requests for business information and regularly failed to meet its contractual obligations. The Agreement itself provides that "Alerton may immediately terminate this Agreement (without advance notice) at any time by giving Dealer written notice of termination . . . in the event of a violation, default. . . or breach by Dealer of any of the terms, conditions, representations or warranties of this Agreement." (Honeywell Ex. 2 ¶ 8(a).) Because Honeywell showed that Alerton had good cause to terminate under section 19(c)(4) of the IDFA and the Agreement for failure to provide requested business information, ABC does not have a "better than negligible" chance of prevailing on the merits. *D.U.*, 825 F.3d at 338.

### C.    Territory Restrictions

Honeywell also claims that, by engaging in projects outside of its assigned dealership territory, ABC breached the Agreement and thus Alerton was entitled to terminate it. In relevant part, the Agreement provides that:

> Except in a case . . . in which Dealer and other applicable dealer(s) have otherwise agreed in advance in writing and Dealer has notified Alerton in advance

> in writing, Dealer shall not engage, directly or indirectly, in any sales, marketing, advertising, or distribution of the Products outside the Territory, nor permit the Products to be sold or shipped for use outside the Territory.

(Honeywell Ex. 2 ¶ 3(g).) The evidence shows that ABC violated this provision at least once, but Honeywell has not shown good cause under section 19(b) or 19(c)(4) for terminating the Agreement on this ground.

Honeywell contends that ABC pursued sales in Wisconsin and California even though both states are outside of its assigned territory in Illinois and Indiana. (R. 30 at 12.) Alerton identified a number of alleged projects in its termination letter "in California (VAFB and LACCD in Los Angeles) and Wisconsin (Lutheran project, Elmbrook Schools, Health & Wellness Addition and Dental Renovation project, Raymond School, and most recently, the JCC Fitness Renovation project)." (Honeywell Ex. 8 at 1.) The evidence presented at the hearing only establishes that the Raymond School project violated section 3(g) of the Agreement.

After receiving the termination letter, ABC responded to each of the named projects in turn. (Honeywell Ex. 9.) Regarding the two California projects, ABC claimed that the projects only involved FIX Consulting, LLC, a separate company owned by Totus, the holding company that also owned ABC. (*Id.* at 1-2.) ABC stated that FIX had never actually bid on providing Alerton products to these projects, but instead had sought business for its consulting business. (*Id.*) In Wisconsin, ABC claimed that the Lutheran project and the Elmbrook Schools project both involved ABC bids using Distech products and not Alerton products. (*Id.* at 2.) Regarding the Health and Wellness addition and the JCC renovation, ABC reported that it had longstanding service agreements with these customers. (*Id.*) ABC acknowledged purchasing Alerton parts from Masters to pursue the Raymond School project. (*Id.*; Tr. at 200.)

At the preliminary injunction hearing, Honeywell failed to demonstrate that ABC's accounts of any of these projects were inaccurate. They did not present any witnesses with direct knowledge of ABC's involvement in these projects and submitted no documents to rebut ABC's explanations. As was adduced in testimony, offering consulting services or bidding projects outside ABC's Alerton territory with Distech or other non-Alerton products does not violate the Agreement. (Tr. at 393.) Nor would servicing Alerton systems so long as new products are not supplied. Only the sale, marketing, advertising, or distribution of Alerton products would establish a breach. The Raymond School project is the only project identified in Alerton's termination letter that, based on the evidence presented to this Court, involved Alerton sales.

ABC's sales of Alerton products it received from Masters for the Raymond School project violated the Agreement because ABC did not enter into a written agreement with Masters. ABC went to lengths at the hearing to establish that it had notified Alerton of its "policy to buy any Alerton components from local distribution including Masters and/or ESI." (ABC Ex. VV at 1.) The Court is skeptical whether such a general policy statement can satisfy the Agreement's notice requirement, but it is uncontested that ABC never entered into a written agreement with Masters. (Tr. at 191; *see also* R. 49 at 6.) Without such an agreement, any extraterritorial sales would constitute a breach regardless of the notice provided to Alerton.[7]

A single breach, however, is not sufficient to warrant termination under sections 19(b) or 19(c)(4). Honeywell failed to establish that ABC breached the Agreement and failed to cure after receiving notice; in the absence of such proof, ABC's failure to cure under section 19(b) cannot be shown. And clearly, a single episode cannot constitute "repeatedly" violating the Agreement.

---

[7] In its post-hearing brief, ABC takes the position that, because Pinder was allegedly aware of ABC's plans to work with Masters, "[t]he 'breach' of not having a written agreement is, therefore, trivial." (R. 49 at 6.) The Court declines to endorse this theory that compliance with half the requirements of a contract makes noncompliance with the other half "trivial" and thus not a breach.

815 ILL. COMP. STAT. 705/19(c)(4). Although the record reflects that ABC did in fact engage in additional extraterritorial projects in apparent breach of the contract, none of these admitted projects were identified by Alerton in its termination letter. Under the IFDA, a party cannot rely on after-acquired evidence to justify termination unless it had good cause to terminate already. *Compare C.C.S. Chi. Recreation, Inc. v. Am. Suzuki Motor Corp.*, No. 90 C 2171, 1996 WL 99906, at *5 (N.D. Ill. Mar. 1, 1996) (finding that court may consider after-acquired evidence of good cause for termination, but only in the context of good cause already having been identified at termination), *with H.R.R. Zimmerman*, 2002 WL 31018302, at *5 (finding that terminating parties may not "allege *de novo* that they had good cause after the fact of termination without good cause"). Alerton's termination letter only identified seven projects as violating the Agreement; it has only substantiated that one of those projects was in fact a violation. Because Alerton did not have good cause to terminate based on ABC's extraterritorial business when it sent its letter, it cannot manufacture good cause on this basis after the fact. Thus, Honeywell has not shown good cause based on extraterritorial sales.

### D.     Failure to Meet Performance Objectives

Finally, Honeywell claims that ABC's "failure to meet performance objectives" provided good cause for Alerton's termination of the Agreement. (Honeywell Ex. 8 at 1.) The relevant portion of the Agreement states that ABC shall "[a]chieve the Product sales levels for the Territory that the Dealer and Alerton will mutually develop, update and agree upon at least annually, and that shall be communicated in substantially the same form as set forth in Exhibit C." (Honeywell Ex. 2 ¶ 3(p).) Notably, although the Agreement has a cover sheet for Exhibit C, it does not include an actual exhibit setting forth details about ABC's sales goals. (*Id.* Ex. C.)

In order for ABC to fail to meet sales goals under the Agreement, those sales goals must be mutually developed by ABC and Alerton. (*Id.* ¶ 3(p).) The parties agree that ABC and Alerton never mutually developed any sales plans during the course of the 2010 Agreement. (Tr. at 21; Tr. at 209 (Q: "[D]id you mutually develop and agree to any sales goals with ABC at any time that you were the regional manager?" Pinder: "Well, I set goals.").) Without mutually agreed-upon sales goals, ABC cannot have failed to meet mutually agreed-upon sales goals. Honeywell has thus failed to establish that this alleged failure provided good cause for its termination.

As explained above, Honeywell has succeeded in showing that it had good cause to terminate under the IFDA, if the Agreement is a franchise, and the Agreement itself allows termination at will, if the Agreement is not a franchise. Thus, despite the very low standard on a motion for a preliminary injunction, ABC has not shown any chance of succeeding on the merits whether or not it can establish the existence of a franchise. Accordingly, the Court need not engage in the balancing of interests between the parties, because ABC has not shown that injunctive relief is appropriate in this case. *BBL, Inc.*, 809 F.3d at 325.

## CONCLUSION

For the foregoing reasons, ABC's motion for preliminary injunction (R. 12) is DENIED. The parties shall appear for a status hearing on October 4, 2016, at 9:45 a.m. The parties are DIRECTED to reevaluate their settlement positions in light of this opinion and to exhaust all settlement possibilities prior to the status hearing.

ENTERED: _____

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: September 22, 2016**